# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT GRELLA, | : | CASE NO. 3:12-cv-02115-GBC |
| | : | |
| Plaintiff, | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| v. | : | MEMORANDUM TO DENY PLAINTIFF'S |
| | : | APPEAL |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | Docs. 10,11,15,16 |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On August 18, 2009, Robert Grella ("Plaintiff") protectively filed an application for Title II Social Security Disability benefits ("DIB"), with an onset date of January 17, 2006 (Tr. 17).

This application was denied, and on January 11, 2011, a hearing was held before an Administrative Law Judge ("ALJ"), where Plaintiff testified and was represented by counsel. (Tr. 31-74). On April 21, 2011, the ALJ issued a decision finding that Plaintiff was not entitled to DIB because Plaintiff could perform reduced range of light work (Tr. 21-22, Finding No. 5). On August

22, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision

of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On October 23, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. §

405(g), to appeal the decision of the Commissioner of the Social Security Administration denying

social security benefits. Doc. 1.

On December 17, 2012, Commissioner filed an answer and administrative transcript of

proceedings. Docs. 9,10. In January, February, and March 2013, the parties filed briefs in support.

Docs. 11,15,16. On May 1, 2014, the Court referred this case to the undersigned Magistrate Judge.

On June 9, 2014, Plaintiff notified the Court that the matter is ready for review, and the parties

consented to Magistrate Judge jurisdiction. Doc. 18.

## II.      Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is

supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson

v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not

mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564

(1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir.

2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more

than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be

less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the

relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then

the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour</u> <u>Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

### III. Relevant Facts in the Record

#### A. Background

Plaintiff, who was only forty-three years old on his alleged disability onset date (Tr. 25, Finding No. 7), is a younger individual according to the Commissioner's Regulations. 20 C.F.R. § 404.1563 (2012). He lives with his parents and his eleven-year-old son (Tr. 37). He has a high school education and past work experience in construction and driving a fork lift (Tr. 163, 168). His past relevant work is as a warehouse worker (heavy unskilled work) and forklift worker (medium semi-skilled work) (Tr. 25). Plaintiff worked as a supervisor / construction worker, prior to his onset

date of January 17, 2006, when he was 43 years of age. He had previously obtained a GED. Pl. Br. at 1, Doc. 11.

The instant appeal stems from Plaintiff's initial application of disability, filed on August 18, 2009 (Tr. 17). Pl. Br. at 1, Doc. 11. Plaintiff alleges disability due to "depression, bipolar disorder, spinal herniation of the mid and lower back, left arm pain, neck fusion at C5 and C6, missing disc in back, and carpal tunnel" (Tr. 162). He reported that he cannot lift anything or sit for long periods, he does not want to leave the house, and he isolates himself (Tr. 162).

Plaintiff also reported that he is able to care for his personal needs, attend Alcoholics Anonymous (AA) meetings and counseling sessions, launder clothes, clean the house, mow the lawn, prepare meals, drive his son to school and help him with homework, go outside daily, walk his dog, shop in stores, watch television, and read (Tr. 174-78). He also indicated that he could pay bills, count change, handle a savings account, and use a checkbook / money orders (Tr. 177).

Plaintiff indicated that he can follow written instructions "good," and he gets along with authority figures (Tr. 179-80). He admitted that his treating physicians never prescribed a cane or other assistive device, and he revealed that his arm pain improved after surgery (Tr. 180, 182). Plaintiff reported that he treated his pain with physical therapy and biofeedback (Tr. 182). He also reported that he took hot showers and received massage therapy (Tr. 182).

### B. Relevant Medical Evidence

### 1. Evidence Relevant to Plaintiff's Physical Impairments

On January 17, 2006, Plaintiff fell from a ladder while working (Tr. 228). He began treatment with Matt Vegari, M.D., for complaints of severe headaches, and neck, back, and shoulder pain (Tr. 233). Upon examination, Dr. Vegari observed limitations in the range of motion of Plaintiff's neck

and shoulders, tenderness in his thoracic spine, and severe lumbo-sacral paraspinal muscle spasm (Tr. 234). He recommended physical therapy and a series of facet blocks, and he prescribed pain medication (Tr. 235). He opined that Plaintiff could not lift more than three to five pounds or engage in pushing or pulling (Tr. 235).

On March 6, 2006, Dr. Vegari reviewed Plaintiff's MRI studies. MRI of Plaintiff's thoracic spine revealed a compression fracture and a bulging disc, a cervical spine MRI revealed a herniated disc and neural foraminal narrowing, and a lumbar spine MRI revealed herniated discs (Tr. 236). Physical examination revealed limited range of motion at Plaintiff's neck and left shoulder, lumbosacral paraspinal muscle spasm, and joint tenderness, but neurological examination findings were unremarkable (Tr. 236). Plaintiff reported that he was performing physical therapy and had received a facet block in the thoracic region (Tr. 236). Dr. Vegari advised Plaintiff to continue these measures and take pain medication (Tr. 237).

On August 16, 2006, Dr. Vegari's colleague, Slobodan Miric, M.D., recorded Plaintiff's complaints of mid-back and left shoulder pain, and opined that Plaintiff was temporarily totally disabled (Tr. 238).

On October 2006, orthopedic surgeon Richard Obedian, M.D., evaluated Plaintiff and reviewed his MRI studies (Tr. 305). Physical examination revealed tenderness and limited range of motion, but was otherwise unremarkable (Tr. 306). Neurological examination results were normal (Tr. 306). An MRI of Plaintiff's lumbar spine revealed herniation, disc desiccation, and right lateral intraforaminal disc herniation; an MRI of Plaintiff's cervical spine revealed mild disc desiccation throughout, mild broad herniation, and mild narrowing of the neural foramina; and an MRI of Plaintiff's left shoulder revealed acromioclavicular (AC) joint hypertrophy without impingement,

and no evidence of recurrent full-thickness rotator cuff tear (Tr. 307). Plaintiff reported that his shoulder pain was intermittent, but grew worse with overhead activity (Tr. 305). Although he complained of constant, unremitting, radiating neck pain, he reported that facet joint blocks of his lower spine provided relief of his mid-lower back pain (Tr. 305).

Dr. Obedian diagnosed rotator cuff sprain, lumbar intervertebral disc without myelopathy, displacement of cervical intervertebral disc, shoulder impingement syndrome, cervical degenerative disc disease, and thoracic sprain (Tr. 307). He administered a cortisone injection to Plaintiff's shoulder, which provided excellent relief of Plaintiff's pain (Tr. 307). Dr. Obedian also recommended anterior cervical discectomy and fusion (ACDF) for Plaintiff's cervical spine (Tr. 307).

Plaintiff reported improvement of his pain when he returned to Dr. Miric on February 12, 2007 (Tr. 239). Dr. Miric encouraged Plaintiff to continue taking Percocet and urged him to use over-the-counter thermal patches as needed for pain (Tr. 239). He opined that Plaintiff should not engage in pushing, pulling or lifting more than ten pounds (Tr. 239). Dr. Miric rendered the same opinion on March 12, 2007 (Tr. 241).

Plaintiff was stable on April 30, 2007 (Tr. 242). He reported an 80% reduction of his pain after receiving facet blocks on May 8, 2007, and experienced additional relief after a series of blocks performed on June 1, 2007 (Tr. 243-44).

Plaintiff underwent arthroscopic surgical repair of a torn rotator cuff on June 5, 2007 (Tr. 395-96). During a post-surgery examination on June 15, 2007, orthopedic surgeon Robert Michaels, M.D., observed excellent shoulder range of motion and advised Plaintiff to begin gentle physical therapy (Tr. 347). On July 2, 2007, Dr. Michaels opined that Plaintiff was healing well despite

experiencing pain after lifting his child (Tr. 347). He advised Plaintiff to continue physical therapy (Tr. 382).

Plaintiff returned to Dr. Miric on July 3, 2007, and reported that he recovered well from surgery but experienced pain after lifting his son (Tr. 247). Dr. Miric advised Plaintiff to continue pain medication, receive additional facet blocks, and avoid pushing, pulling, and lifting more than ten pounds (Tr. 247).

Upon examination on August 10, 2007, Dr. Michaels observed excellent range of motion, good strength, negative drop arm test, and negative impingement sign (Tr. 382). He advised Plaintiff to continue physical therapy (Tr. 382). Plaintiff reported improvement in his strength, stating that he felt better than he did prior to surgery (Tr. 382).

Upon examination on August 31, 2007, Dr. Miric observed full strength in Plaintiff's upper extremities and tenderness in his cervical and thoracic spine (Tr. 248). He opined that Plaintiff was temporarily totally disabled (Tr. 248). On September 28, 2007, Plaintiff complained of pain in his neck, shoulder, and mid-back, but admitted that facet blocks caused a decrease in his pain (Tr. 249). He also reported relief in his lumbar spine (Tr. 249).

When Plaintiff returned to Dr. Michaels on October 10, 2007, he complained of pain with overhead movement, but admitted that he was improving overall (Tr. 382). He described numbness and tingling into his ring and pinky fingers, and Dr. Michaels observed a weak positive impingement sign (Tr. 382). Dr. Michaels diagnosed Plaintiff with status-post left shoulder arthroscopy and consequential left ulnar neuropathy at the elbow (Tr. 382). He also concurred with the opinion of Plaintiff's Workman's Compensation independent medical examination (IME) doctor, who recommended vocational retraining and advised Plaintiff to continue physical therapy (Tr. 383). On

November 7, 2007, Plaintiff reported significant pain relief after undergoing an intraarticular left shoulder injection (Tr. 250).

On December 7, 2007, Plaintiff complained of pain in his left shoulder, as well as numbness and tingling radiating into his pinky finger, but admitted that it improved with physical therapy (Tr. 383). Although Dr. Michaels opined that Plaintiff was moderately partially disabled, he opined that Plaintiff could work if he did not lift over thirty pounds, repeatedly bend, perform overhead work, or work at heights (Tr. 383).

On February 6, 2008, Plaintiff reported less numbness and tingling; his shoulder range of motion was nearly full, and he had a negative impingement sign and good rotator cuff strength (Tr. 358).

In March 2008, Plaintiff reported that his shoulder was "status quo" (Tr. 384). On April 11, 2008, Plaintiff reported that he was diligently performing an independent exercise program, and his shoulder felt somewhat better (Tr. 385). Dr. Michaels opined that Plaintiff had moderate partial disability according to New York State's Workman's Compensation guidelines (Tr. 385).

On May 15, 2008, Dr. Miric advised Plaintiff to continue physical therapy and to apply a local muscle rub ointment for cervical spasm (Tr. 253). On June 11, 2008, he advised Plaintiff to continue physical therapy and pain medication (Tr. 274). Plaintiff reported that he wished to take classes to change his profession (Tr. 274). On July 16, 2008, Dr. Miric opined that Plaintiff's electromyogram (EMG) study was consistent with right carpal tunnel syndrome and cervical root irritation (Tr. 277). An MRI of Plaintiff's left shoulder revealed a bone bruise and evidence of prior rotator cuff surgery, but no new tear (Tr. 277). He opined that Plaintiff remained temporarily totally disabled (Tr. 278).

Despite Plaintiff's complaints of pain in June 2008 and September 2008, Dr. Michaels opined that, overall, Plaintiff's left shoulder range of motion was quite good (Tr. 385-86).

Upon examination of Plaintiff's left shoulder on October 24, 2008, Dr. Michaels observed a positive impingement sign, rotator cuff weakness, and mild restriction in motion (Tr. 386). He performed an injection at Plaintiff's shoulder (Tr. 386). In November 2008, he opined that Plaintiff's range of motion was good and that Plaintiff had reached maximum medical improvement (Tr. 387). On January 16, 2009, Plaintiff complained of pain in the shoulder girdle (Tr. 387). Dr. Michaels opined that Plaintiff experienced ongoing cervical radiculopathy superimposed on his shoulder condition (Tr. 388). In both March and April 2009, Dr. Michaels observed limited range of motion in Plaintiff's neck, and an MRI revealed disc herniation with thecal sac impingement and disc disease (Tr. 363). Dr. Michaels diagnosed cervical radiculopathy and opined that Plaintiff was completely disabled from returning to his occupation (Tr. 363).

On July 2, 2009, Dr. Michaels again opined that Plaintiff was completely and totally disabled from returning to his occupation (Tr. 390). An August 13, 2009 examination was unremarkable, and Dr. Michaels opined that Plaintiff was "certainly" doing better following shoulder surgery, and his cervical spine continued to be his main problem (Tr. 391).

On August 26, 2008, Plaintiff experienced significant pain relief after a series of facet blocks administered by pain specialist Ajay Kumar, M.D. (Tr. 294). On October 2, 2008, Dr. Kumar advised Plaintiff to continue a home stretching and strengthening program, and to continue using his pain medication (Tr. 300).

On October 17, 2008, Dr. Miric observed tenderness in Plaintiff's cervical spine, but noted that he had full muscle strength (Tr. 301). He advised Plaintiff to continue his pain medication (Tr.

301).

During an examination on December 3, 2008, with Dr. Miric's colleague, Fuhai Li, M.D., Plaintiff complained of tenderness in his cervical spine, but reported that his pain remained stable on medication (Tr. 314). An MRI study on Plaintiff's cervical spine, conducted on April 8, 2009, revealed evidence of degenerative changes, herniation, and foraminal narrowing, but no evidence of stenosis, lesion, or compression (Tr. 317). Dr. Li observed no significant changes since Plaintiff's previous study (Tr. 317). On April 20, 2009, Dr. Li examined Plaintiff, observed limited range of motion and tenderness in his neck and left shoulder, and opined that Plaintiff was completely disabled (Tr. 319-20).

On May 19, 2009, pain management specialist Daniel Brietstein, M.D., observed pain with flexion and extension of Plaintiff's cervical spine (Tr. 326). However, he also observed equal and symmetrical neuromuscular strength in Plaintiff's upper extremities, full strength, and equal deep tendon reflexes (Tr. 326).

On August 19, 2009, orthopedic surgeon Philip Fontanetta, M.D., performed ACDF surgery (Tr. 369, 392-93, 397-429). On September 21, 2009, Dr. Fontanetta opined that Plaintiff was doing very well, with good relief of his arm pain, minimal neck pain, and good range of motion (Tr. 389). He advised Plaintiff to perform isometric exercises (Tr. 389). On November 2, 2009, Dr. Fontanetta again opined that Plaintiff was doing well and advised him to continue isometric exercises and stretching, and to apply moist heat (Tr. 389). On December 17, 2009, Dr. Fontanetta reported that Plaintiff was doing well, with good motor strength in both upper extremities, and good neck range of motion (Tr. 530). Although Plaintiff reported a transient episode of some posterior neck pain while working with his arms held out in front of him, Dr. Fontanetta stressed that the pain was

merely transient in nature (Tr. 530). He reviewed an x-ray of Plaintiff's cervical spine and opined that it looked "fine" (Tr. 530).

From June 6, 2008 through October 19, 2009, Edward Stachowiak, M.D, provided Plaintiff with general medical treatment (Tr. 450-509). He treated Plaintiff's asthma and prescribed Suboxone for opiate dependency (Tr. 450-509). Treatment notes reveal that these conditions were well-controlled (Tr. 474).

From June 20, 2008 through September 14, 2009, Plaintiff received general medical treatment at Geisinger Wyoming Valley Medical Center, where physicians managed his Hepatitis C and recorded his complaints of neck and shoulder pain (Tr. 436-49). On September 14, 2009, Plaintiff consulted with orthopedic surgeon David Kolessar, M.D., and admitted that his symptoms improved post ACDF (Tr. 447). Results of Plaintiff's physical examination were benign (Tr. 448).

On April 15, 2010, orthopedic surgeon Vartkes Khachadurian, M.D., conducted an IME (Tr. 602-07). Plaintiff reported that he performed exercises at home and took Tylenol for pain (Tr. 604). He complained of neck pain as well as tightness, pinching, burning, and a heavy, numb feeling in his arms (Tr. 605). He described throbbing pain that radiated to the left side while he slept (Tr. 605). Plaintiff was able to ambulate independently with no evidence of antalgia or limp, and he could rise on his heels and toes without difficulty (Tr. 606). He displayed normal cervical lordosis with no evidence of spasm or shift, flexed forward to forty degrees, and backwards to thirty degrees, rotated right and left to thirty degrees, and tilted right and left to twenty degrees with some pain radiating to the trapezius and scapular areas (Tr. 606). His deep tendon reflexes and pulses were normal, and he displayed negative Tinel's and Phalen's signs (Tr. 606). Plaintiff exhibited normal dorsal kyphosis, normal lumbar lordosis, and normal deep tendon reflexes (Tr. 606). Although

impingement and rotator tests caused mild pain bilaterally, Plaintiff's acromioclavicular joints were normal (Tr. 606). Dr. Khachadurian opined that Plaintiff was moderately disabled according to the New York State Workmen's Compensation Board Medical Guidelines (Tr. 607).

## 2. Evidence Relevant to Plaintiff's Mental Impairments

From October 2, 2009 through December 19, 2009, Plaintiff received mental health treatment at Northwestern Human Services (Tr. 532-53). At his initial assessment, Plaintiff complained of depression, anxiety, and anger (Tr. 543). The clinician noted that Plaintiff was oriented in all spheres, his appearance and thought content were appropriate, his speech was normal, his thought process was clear and coherent, his mood and affect were normal, and his memory was adequate (Tr. 551). In addition, Plaintiff's attitude was positive, he was actively engaged, and his daily functioning level was good (Tr. 552).

During a psychiatric evaluation conducted on November 21, 2009, Plaintiff reported that he became depressed when he was tired (Tr. 535-40). On December 9, 2009, Plaintiff appeared for medication refills (Tr. 534). The psychiatrist noted that Plaintiff was appropriately groomed, he was cooperative, his speech and mood were normal, his affect was full range, and his thoughts were goal-directed (Tr. 534). Plaintiff denied suicidal and homicidal ideation (Tr. 534).

## 3. Consultative Examination Report

On July 8, 2008, Tiffany Griffiths, Psy.D., performed a consultative mental examination (Tr. 255-58). Plaintiff was appropriately dressed and groomed, and exhibited no behavioral or psychomotor abnormalities (Tr. 257). He was cooperative, interactive, alert, and oriented (Tr. 257). Although he reported experiencing racing thoughts, he exhibited logical and coherent thought processes during the examination (Tr. 257). He exhibited average intelligence and intact abstract thinking, concentration, and memory function (Tr. 257).

Based on her examination findings, Dr. Griffiths opined that Plaintiff's prognosis was fair and his abilities in the areas of daily living, social functioning, and concentration were adequate despite the limitations caused by his impairment (Tr. 257-58).

### 4. State Agency Physician Reports

On December 24, 2009, state agency mental health expert Paul Tarren, Ph.D., reviewed the record and completed a psychiatric review technique form (PRTF) and mental RFC assessment (Tr. 554-70).

Dr. Tarren opined that Plaintiff had mild restriction of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace (Tr. 564). Based on his review of the record, Dr. Tarren noted that Plaintiff himself reported that he had no problems tending to self-care, he could perform routine chores and meal preparation, drive a car, go out unaccompanied, shop, manage finances, use a computer, read, attend church and AA meetings, and he got along with persons of authority (Tr. 567). As a result, Dr. Tarren opined that Plaintiff was partially credible and could carry out simple, routine tasks despite the limitations resulting from his impairment (Tr. 570).

On January 12, 2010, Sharon Wander, M.D., a state agency physician who reviewed the record, opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand and walk for about six hours in an eight-hour day, sit for about six hours during an eight-hour day, and engage in unlimited pushing and/or pulling (Tr. 572). Dr. Wander noted that Plaintiff's self-described daily activities were not significantly limited in relation to his alleged symptoms, and that his treatment methods, including medication, were generally successful in controlling his symptoms (Tr. 576).

//

### IV.   Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### A.   Plaintiff Allegations of Error

### 1.   ALJ Residual Functional Capacity Finding

Plaintiff contends the ALJ erred in determining Plaintiff's residual functional capacity by failing to properly consider Plaintiff's left shoulder, neck, depression, back, and carpal tunnel impairments. Pl. Br. at 2, Doc. 11. The ALJ evaluated the record before determining Plaintiff's

residual functional capacity.

### a. ALJ Review and Findings

"Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical spine (status post cervical diskectomy and fusion), left shoulder pain (status post left rotator cuff repair), right shoulder pain, asthma, and depression. 20 C.F.R. § 404.1520(c)." (Tr. 19).

"The treatment records also document that, during the relevant period, the claimant experienced low back pain. However, the claimant's treatment records do not support significant ongoing limitations during the relevant period and so this impairment will be treated as non-severe for the purposes of this decision. While there is mention in Dr. Miric's records of tenderness in the lumbar and thoracic region, and while the MRI films of both the thoracic and lumbar spine show disc bulging / herniation, there is very little mention in the records of significant low back or mid back pain. In fact, in an examination performed by Dr. Briestein diagnosed lumbar sprain. The claimant testified that he received epidural injections in his lower back in May of 2009. However, at the time of his examination in April of 2010, he was merely taking over the counter Tylenol for back pain." (Tr. 19-20) (emphasis added).

"While the [ALJ] does not find that the claimant's low back pain has more than a minimal effect on the claimant's ability to perform basic work activities, the [ALJ's] residual functional capacity set forth below accommodates the claimant's low back complaints, and so the claimant is not disadvantaged by this finding." (Tr. 20).

"Finally, the claimant alleges that he suffers from carpal tunnel syndrome, which is suggested by way of EMG and treatment records as a differential diagnosis. However, even giving the claimant the benefit of every reasonable inference, the record does not establish that this impairment, if it

exists, has more than a minimal effect on the claimant's ability to perform basic work activities and will, therefore, be treated as non-severe for the purpose of this decision." (Tr. 20) (emphasis added).

"The [ALJ] has considered the claimant's alleged neck and back pain under the listing 1.04. While claimant's counsel asserts that the claimant's neck and back impairments meet the requirements of section 1.04 of the listings, the record does not indicate that the claimant has nerve root compression of the spine, nor do the clinical findings indicate that the claimant has consistently had a neuro-anatomic distribution of pain, limitation of motion, of the cervical / thoracic / lumbar spine, neuro-anatomic sensory or reflex loss, or a positive straight-leg raising test for a period of twelve continuous months following his alleged onset of disability." (Tr. 20).

"The claimant's mental impairment did not meet or medically equal the criteria of listing 12.04." (Tr. 20).

"In activities of daily living, the claimant had mild restriction. He is able to drive, take care of his own personal needs, prepare meals, and do laundry." (Tr. 21) (emphasis added).

"In social functioning, the claimant had moderate difficulties. While he alleges that he is isolated and angry, he attends church services, group therapy and meetings." (Tr. 21) (emphasis added).

"With regard to concentration, persistence or pace, the claimant had moderate difficulties. He alleges that he has difficulties with memory and concentration. However, he admits that he can follow written instructions, he can read and watch television." (Tr. 21) (emphasis added).

"As for episodes of decompensation, the claimant had experienced no episodes of decompensation, which have been of extended duration. The claimant had previous admissions 1986 and 1998. However, the record shows no such evidence of decompensation during the relevant period." (Tr. 21).

"The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process . . . Therefore, the following residual functional capacity assessment reflects the degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis." (Tr. 21).

"After careful consideration of the entire record, the [ALJ] finds that, through the date last insured,  the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant must be allowed to sit on an hourly basis to relax from a standing / walking position. He is limited to occasional overhead reaching and occasional climbing of ramps and stairs. He must avoid ladders, ropes, and scaffolds and must avoid crawling except in an emergency. He must avoid concentrated exposure to respiratory irritants or poorly ventilated areas. He is limited to simple unskilled work with no independent judgment or decision making and only occasional changes in work place environment." (Tr. 21-22).

"The claimant has a number of medical problems, including degenerative disc disease of the cervical spine (status post cervical diskectomy and fusion), degenerative disc disease of the lumbar spine, left shoulder pain (status post left rotator cuff repair), right shoulder pain, and depression. These impairments are severe insofar as they limit the claimant to a range of light work as set forth above. However, they are not so severe as to be completely disabling. The claimant is capable of doing a range of light unskilled work on a sustained and consistent basis despite the limitations arising as a result of his impairments." (Tr. 22).

"The claimant alleges disability due to mid back herniation, low back herniation, left arm pain, neck fusion, missing disc in back, carpal tunnel, and depression stemming from a work injury in January 2006. He alleges that he cannot lift anything and cannot sit or stand for long periods of time. In his function report, he describes his pain as burning in his neck and mid back with shooting

and numbness in his left arm and sometimes his right arm, with dull achy pain in his low back sometimes shooting down his left leg. He alleges that he has difficulties lifting, squatting, bending, standing, reaching, sitting, walking and kneeling." (Tr. 22) (emphasis added).

"With regard to his mental impairment, the claimant alleges that his mind races and he has difficulties with memory and concentration. He alleges difficulties getting along with others and alleges that he is isolated and angry." (Tr. 22).

"At the hearing in this matter, the claimant testified that he had neck surgery in 2009 but that he still experiences neck pain. He testified that he also experiences bilateral shoulder pain and experiences pain in his neck and shoulders when lifting overhead. With regard to his mental impairment, he testified that, while he recently started going to counseling, there are some days in which he cannot get out of bed (Hearing Testimony). He has been receiving workers' compensation benefits since the alleged onset date of disability." (Tr. 22-23).

"In terms of the claimant's alleged neck and shoulder complaints, the medical evidence of record does not support a finding that the claimant was completely disabled during the relevant period. The treatment records confirm that the claimant was involved in a work accident in January of 2006, in which he sustained neck and shoulder injuries. He was diagnosed with a left rotator cuff tear and underwent arthroscopic repair in June 2007 as well as cervical diskectomy and fusion in August of 2009. The claimant's treating doctor's notes document his successful rotator cuff surgery and neck surgery." (Tr. 23) (emphasis added).

"While the claimant continued to complain of a limited amount of pain in his neck and shoulder following surgery, the treatment notes repeatedly show significant improvement with good relief of arm pain, minimal neck pain, and good range of motion. The claimant reported to his treating doctor that, while he had occasional pain in the left scapula and stiffness when rotating or

bending his neck, he had no radicular pain or radicular symptoms and findings on physical examination showed normal strength in his left upper extremity." (Tr. 23) (emphasis added).

"The most recent treatment notes from the claimant's orthopedic surgeon, Dr. Michaels, simply noted occasional discomfort in the shoulder from time to time. Similarly, the most recent treatment notes of another treating orthopedic surgeon, Dr. Fontanetta, with the exception of a transient episode of posterior neck pain, are not particularly adverse. Those records show good motor strength in both upper extremities, good range of motion of the neck, and a normal examination. Despite this documented improvement in his symptoms, the claimant has never returned to work in any capacity since his work injury and continued to receive workers' compensation benefits." (Tr. 23) (emphasis added).

"There is mention in the medical records of asthma. The claimant testified that he recently began taking medication to control his symptoms. However, the claimant continues to smoke, which tends to suggest that the claimant's breathing difficulties are not as frequent or severe as he alleges. Nevertheless, in deference to the claimant, the [ALJ] accommodated this impairment in the above residual functional capacity." (Tr. 23).

"With regard to the claimant's mental impairment, the treatment records document depressive disorder with a history of drug and alcohol abuse in remission. These records indicate that the claimant was preoccupied in his thought process and that he experiences depressive mood and racing thoughts. However, in a 2008, consultative examination with Tiffany Griffiths, Psy.D., the claimant's concentration and memory functions were noted to be intact. His language reception and expression were noted to be intact and he reported to examinations alert and interactive. Dr. Griffiths noted that the claimant's functional capacities were generally adequate with regard to daily living, social functioning, and concentration." (Tr. 23-24).

"Just as the above treatment records do not support a finding of disability, neither does the claimant's activities of daily living. He can dress and bathe himself. He is able to drive himself to appointments and drive his son to school. He can do laundry, mow the lawn, and prepare his own meals. In short, the claimant's allegations regarding his limitations are inconsistent with the medical evidence of record as well as the claimant's activities of daily living." (Tr. 24) (emphasis added).

"As for the opinion evidence, the [ALJ] notes that a number of claimant's treating physicians, including Dr. Briestein, Dr. Fontanetta, Dr. Kumar, Dr. Miric, Dr. Li, Dr. Michaels, Dr. Obedian, and Dr. Stachowiak, have all (at one time or another) indicated that the claimant is 'disabled.' However, in each instance, it is not clear that the doctor in utilizing the term was relating in the same manner as the Social Security Administration defines 'disability' in the Social Security Act and regulations. Specifically, it is possible that the doctor in each instance was referring solely to the claimant's inability to perform his past relevant work, which is consistent with the conclusions reached in this decision. Moreover, the issue of disability is an issue reserved to the Commissioner. In any event, the [ALJ] gives little weight to these opinions as they are inconsistent with the relatively minimal abnormal findings (post neck and shoulder surgeries), and rather conservative pain management efforts thereafter as referenced in the relevant treatment records and the record as a whole as more fully discussed above. The generally minimal findings suggest that the surgical treatment efforts have had their intended effect. Moreover, most of the opinions offered do not relate that the claimant is totally and completely precluded from performing all kinds of work." (Tr. 24). (emphasis added).

"The [ALJ] also gives little weight to the opinion of Dr. Vegari, who advised the claimant not to lift objects more than 5 pounds and to avoid pulling and pushing type activities. This restriction was placed on the claimant in 2006 and was not reinforced at the extent of the claimant's

debilitation by any other treating source and somewhat incongruent with this level of exertional restriction is the fact that most of the findings upon clinical examination by Dr. Vegari did not reveal any significant motor deficits or strength loss in the extremities. The [ALJ] notes that, while Dr. Vegari did have a treating relationship with the claimant, the treatment history is quite brief and Dr. Vegari did not have the benefit of reviewing the longitudinal treatment records contained in the current record." (Tr. 24).

"In sum, the above residual functional capacity assessment is supported by the treatment records, the consultative psychological examination, and the record as a whole. In recognition of the claimant's medical issues and the limitations that would seem to exten[d] from these problems, the [ALJ] has incorporated the claimant's neck, back, and shoulder impairments into the formulation of the residual functional capacity assessment by restricting the claimant to a limited range of light exertional work. Additionally, the restriction to unskilled work accommodates the claimant's mental impairments and the environmental restrictions accommodate the claimant's asthma." (Tr. 24).

### b. Summary of ALJ Findings

Plaintiff contends the ALJ erred in failing to properly consider Plaintiff's left shoulder, neck, depression, back, and carpal tunnel impairments. Pl. Br. at 2, Doc. 11. From the review of the record, the ALJ throughly evaluated treatment records; MRI films; records of complaints of pain; medications for pain; allegations of back pain and carpal tunnel syndrome; activities of daily living; social functioning; concentration, persistence or pace; no episodes of decompensation during the relevant period; limitations; impairments; medical problems, including degenerative disc disease of the cervical spine (status post cervical diskectomy and fusion), degenerative disc disease of the lumbar spine, left shoulder pain (status post left rotator cuff repair), right shoulder pain, and depression; allegations of disability due to mid back herniation, low back herniation, left arm pain,

neck fusion, missing disc in back, carpal tunnel, and depression; hearing testimony; treating doctor's notes documenting successful rotator cuff surgery and neck surgery; Plaintiff's continued complaints of limited amount of pain in his neck and shoulder following surgery with the treatment notes repeatedly showing significant improvement with good relief of arm pain, minimal neck pain, and good range of motion; Plaintiff reported to his treating doctor that, while he had occasional pain in the left scapula and stiffness when rotating or bending his neck, he had no radicular pain or radicular symptoms and findings on physical examination showed normal strength in his left upper extremity; the most recent treatment notes from the claimant's orthopedic surgeon simply noted occasional discomfort in the shoulder from time to time; the most recent treatment notes of another treating orthopedic surgeon are not particularly adverse, with the exception of a transient episode of posterior neck pain; the records showed good motor strength in both upper extremities, good range of motion of the neck, and a normal examination; despite this documented improvement in his symptoms, Plaintiff never returned to work in any capacity since his work injury and continued to receive workers' compensation benefits; records document depressive disorder with a history of drug and alcohol abuse in remission; opinion evidence; treating physicians indicated Plaintiff was 'disabled,' but it is possible the doctors referred to Plaintiff's inability to perform past relevant work, which is consistent with the conclusions reached in this decision; opinions are inconsistent with relatively minimal abnormal findings (post neck and shoulder surgeries) and rather conservative pain management efforts; the generally minimal findings suggest the surgical treatment was effective; the opinions do not state Plaintiff is precluded from performing all kinds of work; and the [ALJ] incorporated Plaintiff's neck, back, and shoulder impairments into the formulation of the residual functional capacity assessment by restricting Plaintiff to a limited range of light exertion with the restriction to unskilled work to accommodate Plaintiff's mental impairments (Tr. 19-24).

Plaintiff states the ALJ erred in concluding Plaintiff's neck and shoulder impairments improved before the date last insured. Pl. Br. at 2, 4, 9, Doc. 11. Plaintiff also alleges the ALJ mischaracterized the medical evidence pertaining to Plaintiff's depression, improperly determined Plaintiff's back was not severe, and failed to properly consider Plaintiff's bilateral carpal tunnel syndrome. Pl. Br. at 2, 9-10, Doc. 11. Although Plaintiff argues there were medical records to support disability, the ALJ had substantial evidence for the decision, which is the standard on appeal.

### (1)    Plaintiff's Depression Impairment and GAF Score

Plaintiff references Dr. Griffiths' diagnosis involved major depression, with a GAF of 51. She noted he had a history of polysubstance abuse, but that he had now been clean for an extended period of time. She opined Plaintiff could not be responsible for his own finances. Tr. 255-258. Pl. Br. at 10, Doc. 11.

The Diagnostic and Statistical Manual of Mental Disorders-IV, the source of the GAF scale, instructs that a GAF score is based on the symptom severity or level of functioning at the time of the examination. Courts within the Third Circuit have accepted the Commissioner's position that GAF scores are not dispositive of disability. See, e.g., Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir. 2009) (explaining that a GAF score of 45 did not warrant remand given that no statement of specific functional limitations accompanied the score); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).

"We further find no error with respect to the ALJ's evaluation of the Plaintiff's mental impairments in fashioning his RFC. The ALJ found Plaintiff was limited to simple, routine, repetitive tasks not involving fast pace or more than simple work decisions, and could have only incidental collaboration with coworkers and the public and collaboration with the supervisor for about 1/6 of the time. Plaintiff argues that the ALJ's RFC finding failed 'to encapsulate all of the

limitations flowing from [his] severe mental illness' and contends that his low GAF score of 45 demonstrates a complete inability to work. The ALJ specifically rejected this GAF score assessed by [the treating psychiatrist], however, as inconsistent with the remaining medical evidence. An ALJ may properly reject a GAF score when it is inconsistent or unsupported by the record as a whole. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005); Blakey v. Astrue, 2010 WL 2571352 at *11 (W.D. Pa. 2010)." Klein v. Colvin, No. 13-cv-1497, 2014 WL 2562682, at *11 (W.D. Pa. June 06, 2014).

"Plaintiff next argues that the findings of consultative examiner [ ] were not properly credited by the ALJ. The ALJ noted the marked and extreme limitations findings, and low GAF score, assessed by [the consultative examiner] in his decision. The ALJ found—as did [the state agency evaluator]—that these findings were inflated, and not an accurate representation of Plaintiff's mental health history. In support of his position, the ALJ cited to Plaintiff's psychiatric treatment at Safe Harbor between October 2009 and October 2010, which revealed a marked—and sustained—increase in Plaintiff's GAF scores, as well as improved mental functioning. Observations by [the consultative examiner] about Plaintiff's appearance were at odds with those at Safe Harbor, as was the anomalous diagnosis of PTSD. Further, [the state agency evaluator] concluded based upon her evaluation of the medical record, that [the consultative examiner's] findings were out of proportion to what was found in Plaintiff's mental treatment history. Her limitations findings did not exclude Plaintiff from finding work. The court, therefore, finds that the ALJ adequately supported his decision to accord [the consultative examiner's] findings diminished weight with substantial evidence from the medical record, particularly the lengthy treatment record from Safe Harbor, the latter portion of which revealed significant improvement in Plaintiff's mental status. Lastly, to the extent that Plaintiff argues that the ALJ erred in failing to accommodate [the consultative

examiner's] finding of marked limitation with respect to interacting with the public, the ALJ clearly indicated that the work which Plaintiff could sustain would not include frequent interaction with the public. Specifically, the ALJ stated that 'the claimant has a need to avoid repetitive reaching, any climbing, and frequent interaction with the general public. As such, Plaintiff's argument is moot.' See Lamb v. Colvin, No. 12-cv-137, 2013 WL 5366260, at *10 (W.D. Pa. Sept. 24, 2013).

Similarly in this case, the ALJ weighed the evidence in the record and accommodated Plaintiff's depression impairment by limiting the residual functional capacity to a range of light exertion with the restriction to unskilled work (Tr. 24).

### (2)    ALJ Evaluation of the Evidence

Plaintiff argues the ALJ erred in failing to explain how he evaluated all relevant evidence. In particular, Plaintiff states the ALJ did not make clear in the decision if he reviewed all diagnostic testing and the post-operative left shoulder MRI. Pl. Br. at 4, 8, Doc. 11.

Although the diagnostic testing and the post-operative left shoulder MRI may not be specifically mentioned in the decision, this does not mean that the ALJ did not review them. See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001) (stating that there is no requirement for ALJ to discuss or refer to every piece of relevant evidence in the record, so long as the reviewing court can discern the basis of the decision). In addition, the ALJ noted that he considered all of the evidence of record. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (stating that the mere failure to cite to specific evidence does not establish that the ALJ failed to consider it); Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (stating that the ALJ need not evaluate in writing every piece of evidence submitted).

The ALJ accounted for Plaintiff's impairments by limiting him to a reduced range of light work. Remand to address the record more fully would be inappropriate because it would not change

the Commissioner's ultimate decision. It is well settled that courts should affirm the Commissioner's decision, even where there is error, if there is "no question that he would have reached the same result notwithstanding" the error. <u>Mickles v. Shalala</u>, 29 F.3d 918, 921 (4th Cir. 1994); <u>Rutherford v. Barnhart</u>, 339 F.3d 552 (3d Cir. 2005) (remand is not appropriate if the evidence does not affect the outcome). <u>Schrader v. Astrue</u>, No. 4:11–CV–902, 2012 WL 4504625, at *12 (M.D. Pa. Sept. 28, 2012) (the ALJ's failure to address specifically the statement of Plaintiff's mother in the decision was harmless error at most). In this case, the medical evidence would only be cumulative and would not add to the record that Plaintiff, doctors, and laboratory results did not already provide themselves. Therefore, the evidence has already been effectively considered by the ALJ and taken into account by the RFC assessment. Accordingly, remand for further consideration of the record would be unnecessary.

Additionally, Plaintiff argues the ALJ mentioned the lumbar MRI in the decision but the actual report was not contained in the medical record. (Tr. 19-20). Pl. Br. at 12-13, Doc. 11. Although the actual MRI report is not in the record, Plaintiff's doctors remarked on lumbar MRI results in the record. (Tr. 236, 307, 605).

### c. Case Law and Analysis

Although several of Plaintiff's treating physicians opined that Plaintiff was at least partially disabled, different governmental agencies utilize different statutory tests for disability. The social security regulations expressly provide that social security disability determinations must be based upon social security law. 20 C.F.R. § 404.1504. Decisions by other governmental agencies are not binding upon the Commissioner. 20 C.F.R. § 404.1504. Thus, the disability opinions of Plaintiff's physician's, which were rendered for use by workers' compensation, were not binding up the ALJ.

The weight afforded to any medical opinion is dependent on a variety of factors, including

the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); Plummer, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion. Id. The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled. Id. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. Id. The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. Lyons-Timmons v. Barnhart, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler, 667 F.3d at 361; Coleman v. Astrue, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ, and that an ALJ is free to reject a medical source's conclusions. Chandler, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can

determine whether "significant probative evidence was not credited or simply ignored." <u>Cotter v.</u> <u>Harris</u>, 642 F.2d 700, 705 (3d Cir.1981). <u>Mistick v. Colvin</u>, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

In <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d at 362, the Third Circuit held that the district court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." <u>Id.</u> "The ALJ– not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." <u>Id.</u> at 361 (citing 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

In Plaintiff's reply, he states there is medical evidence to support Plaintiff's disability. This may be true, but there is also medical evidence to support non-disability. Pl. Reply at 3, Doc. 16.The standard is substantial evidence, i.e., more than a scintilla, and the ALJ's decision meets this standard. <u>Plummer</u>, 186 F.3d at 427.

Plaintiff contends the ALJ failed to classify the back and carpal tunnel as "severe" impairments. Pl. Br. at 2, 10, Doc. 11. However, even though the ALJ did not classify the impairments as "severe," he accounted the credibly established limitations in the residual functional capacity.

"[Plaintiff] contends that the ALJ erred in failing to determine whether his obesity was a "severe" impairment, and in failing to consider that impairment in assessing his residual functional capacity. As an initial matter, [Plaintiff] was not denied benefits at the second step of the sequential evaluation process. <u>McCrea v. Commissioner of Social Security</u>, 370 F.3d 357, 361 (3d Cir. 2004) (remarking that "step two is to be rarely utilized as [a] basis for the denial of benefits"). Since the ALJ determined that [Plaintiff] had "severe" impairments, this case proceeded through the remaining steps of the process. The assessment of a claimant's residual functional capacity must account for

both "severe" and "nonsevere" impairments. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Where at least one impairment is found to be "severe" and the limitations resulting from the claimant's remaining impairments are properly considered, an error committed at the second step of the process with respect to one of those other impairments is inconsequential. Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 244 (6th Cir. 1987)." See McCleary v. Astrue, No. 10–1116, 2011 WL 4345892, at *9 (W.D. Pa. Sept. 15, 2011).

Similarly in this case, the ALJ found Plaintiff had other severe impairments, namely degenerative disc disease of the cervical spine (status post cervical diskectomy and fusion), left shoulder pain (status post left rotator cuff repair), right shoulder pain, asthma, and depression, and the decision proceeded through the remaining steps in the disability process (Tr. 19). Plaintiff argues the ALJ erred in failing to use the *de minimis* standard, which is a low threshold to screen out groundless disability claims. However, the ALJ did not "screen out" Plaintiff's claim and found other severe impairments.

Even if the ALJ should have considered the back and carpal tunnel as "severe" impairments, the error was harmless and would not have altered the result. The ALJ allocated for Plaintiff's credibly established limitations and found he could do a reduced range of light work.

The burden lies with Plaintiff to demonstrate harm from such error that would have changed the ALJ's decision, but he has not done so here. Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009); see also Molina v. Astrue, 674 F.3d 1104, 1111, 1115-22 (9th Cir. 2012). "No principle of administrative law 'requires that we convert judicial review of agency action into a ping-pong game' in search of the perfect decision." Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common

sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. SSR 96–7p, 61 Fed. Reg. 34483 (July 2, 1996). In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Jury v. Colvin, No. 3:12-cv-2002, 2014 WL 1028439 (M.D. Pa. Mar. 14, 2014). When the Court reviews  the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v. Commissioner of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citing Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

Plaintiff contends the findings on the thoracic spine and carpal tunnel syndrome were barely mentioned or reviewed. Pl. Br. at 12, Doc. 11. Plaintiff also states the ALJ all consideration of the back only involved any findings pertaining to the lower back. However, the ALJ reviewed Plaintiff's

thoracic spine and carpal tunnel in the decision to determine Plaintiff's residual functional capacity.

"While there is mention in Dr. Miric's records of tenderness in the lumbar and <u>thoracic</u> region, and while the MRI films of both the <u>thoracic</u> and lumbar spine show disc bulging / herniation, <u>there is very little mention in the records of significant low back or mid back pain</u>. In fact, in an examination performed by Dr. Briestein diagnosed lumbar sprain. The claimant testified that he received epidural injections in his lower back in May of 2009. However, <u>at the time of his examination in April of 2010, he was merely taking over the counter Tylenol for back pain</u> . . . [T]he <u>claimant alleges that he suffers from carpal tunnel syndrome, which is suggested by way of EMG and treatment records as a differential diagnosis. However, even giving the claimant the benefit of every reasonable inference, the record does not establish that this impairment, if it exists, has more than a minimal effect on the claimant's ability to perform basic work activities and will, therefore, be treated as non-severe for the purpose of this decision</u> . . . The [ALJ] has considered the claimant's alleged neck and back pain under the listing 1.04. While claimant's counsel asserts that the claimant's neck and back impairments meet the requirements of section 1.04 of the listings, the record does not indicate that the claimant has nerve root compression of the spine, nor do the clinical findings indicate that the claimant has consistently had a neuro-anatomic distribution of pain, limitation of motion, of the cervical / <u>thoracic</u> / lumbar spine, neuro-anatomic sensory or reflex loss, or a positive straight-leg raising test for a period of twelve continuous months following his alleged onset of disability . . . The claimant alleges disability due to <u>mid back herniation</u>, low back herniation, left arm pain, neck fusion, missing disc in back, <u>carpal tunnel</u>, and depression stemming from a work injury in January 2006. He alleges that he cannot lift anything and cannot sit or stand for long periods of time. In his function report, he describes his pain as burning in his neck and <u>mid back</u> with shooting and numbness in his left arm and sometimes his right arm, with dull achy pain

in his low back sometimes shooting down his left leg. He alleges that he has difficulties lifting, squatting, bending, standing, reaching, sitting, walking and kneeling . . . [T]he [ALJ] has incorporated the claimant's . . . <u>back</u> . . . impairments into the formulation of the residual functional capacity assessment by restricting the claimant to a limited range of light exertional work." (Tr. 19-20, 22, 24) (emphasis added).

The ALJ noted Plaintiff engages in many activities of daily living. He is able to drive, take care of his own personal needs, prepare meals, and do laundry. He can dress and bathe himself. He is able to drive himself to appointments and drive his son to school. He can do laundry, mow the lawn, and prepare his own meals. The ALJ found Plaintiff's allegations regarding his limitations as inconsistent with the medical evidence of record as well as the claimant's activities of daily living. (Tr. 21, 24).

Plaintiff argues Commissioner mischaracterized Plaintiff's testimony and he is unable to do those activities. Pl. Reply at 9, Doc. 16. However, the regulations require the ALJ to find that Plaintiff is unable to do activities and his disability is expected to last continuously for a year. To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last <u>for a continuous period of not less than 12 months</u>." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A) (emphasis added). Thus, Plaintiff's impairments and inability to do activities must also meet the durational requirement.

Plaintiff contends the ALJ did not allow for Plaintiff's carpal tunnel in the RFC. Pl. Reply at 7, Doc. 16. However, the ALJ limited Plaintiff to a reduced range of light work, which took into account his limitations and impairments, such as the ability to lift heavy objects with his hands.

"[T]he ALJ cannot accommodate limitations which do not exist, or which cannot be found in the medical record. No specific functional limitations were provided by any of Plaintiff's medical sources with respect to her carpal tunnel syndrome, and the ALJ limited the amount of weight Plaintiff could lift with her arms in his RFC and hypothetical. The Court finds that the ALJ's finding was supported by substantial evidence and will not remand for further consideration of Plaintiff's . . . carpal tunnel syndrome." Rybarik v. Astrue, No. 12–515, 2012 WL 5906162, at *6 (W.D. Pa. Nov. 26, 2012).

"Plaintiff next argues that the hypothetical to the ALJ was critically deficient, in that it failed to acknowledge plaintiff's restrictions to handle and work with small objects with both hands, and also failed to acknowledge that medications that plaintiff was using would prevent him from working. In view of the scarcity of medical evidence regarding plaintiff's dextral limitations, the ALJ did not err in omitting such limitations from the hypothetical question. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) ('We do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant . . . the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations')." Clark v. Astrue, 844 F. Supp. 2d 532, 547 (D. Del. Feb. 15, 2012).

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence

properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in the record. Plaintiff's subjective complaints were corroborated only by her own self-reports, which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

Thus, the ALJ's RFC finding includes only "credibly established limitations" and not all impairments alleged by claimant, Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005). Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual functional capacity, and the findings are supported by substantial evidence.

## 2. Question to Vocational Expert

Plaintiff contends the ALJ's hypothetical question to the Vocational Expert ("VE") did not include all of Plaintiff's impairments. Pl. Br. at 2, 13-14, Doc. 11.

At the administrative hearing, the ALJ asked the VE whether jobs existed for a person of Plaintiff's age, education, and work experience, who could perform light work with additional limitations, including sitting on an hourly basis; occasionally climbing ramps and stairs and reaching overhead; never climbing ladders, ropes, or scaffolds; avoiding crawling except in an emergency; avoiding concentrated exposure to respiratory irritants or poorly ventilated areas; simple, unskilled work with no independent judgment or decision making; and only occasional changes in the work environment (Tr. 63-64). The VE responded that such a hypothetical person could perform the unskilled, light jobs of general office worker, receptionist / office clerk, and courier (Tr. 64). The VE further testified that these jobs could be performed by an individual at the sedentary as well as light level of exertion (Tr. 64-65).

Plaintiff contends the ALJ disregarded another hypothetical question to rely on the initial RFC hypothetical. Tr. 65. Pl. Br. at 14, Doc. 11. The ALJ correctly discounted this testimony by the VE on the grounds that the hypothetical question was inconsistent with the record evidence.

Plaintiff argues the jobs proposed by the VE (receptionist / general office clerk, and courier / messenger) do not meet the restrictions imposed by the ALJ, namely unskilled work with proper ventilation / no exposure to respiratory irritants, and limitations on standing, walking, and climbing

stairs. Pl. Br. at 14, Doc. 11.

"The Court does not find any error with the ALJ accepting the VE's testimony regarding the number of addresser, document preparer, and order preparer jobs that are available in the national and local level. Social Security Regulations explain that: 'When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of—(1) Dictionary of Occupational Titles, published by the Department of Labor; (2) County Business Patterns, published by the Bureau of the Census; (3) Census Reports, also published by the Bureau of the Census; (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics. 20 C.F.R. § 404.1566(d).'" McKinnon v. Commissioner of Social Sec., No. 12–4717, 2013 WL 5410696, at *5 (D. N.J. Sept. 26, 2013).

From a review of case law, it appears these jobs are standard vocational expert recommendations for plaintiffs with similar restrictions.

See Herring v. Colvin, No. 3:13–CV–00004, 2014 WL 1052078, at *12-13 (M.D. Pa. Mar. 18, 2014) ("[Plaintiff]. . . had the residual functional capacity to perform a limited range of unskilled to semi-skilled, sedentary work . . . that limited her to only occasional use of her right upper extremity, but did not require forceful or repetitive use of the right hand and right upper extremity; and no more than occasional kneeling, crouching, bending, climbing, crawling or stooping. Based on . . . the testimony of a vocational expert . . . [the plaintiff] could perform unskilled to semi-skilled, sedentary work as a video monitor and as a telephone receptionist or information clerk, and that there were a significant number of such jobs in the local labor market of central Pennsylvania . . . Our

review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, the court will affirm the decision of the Commissioner") (emphasis added).

See also Carayiannas v. Colvin, No. 3:12–CV–01270, 2014 WL 582393, at *6 (M.D. Pa. Feb. 14, 2014) ("Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that [plaintiff] could perform unskilled, sedentary work as a telephone receptionist and as a sorter (clerical), and that there were a significant number of such jobs in the regional and national economies"); Perez v. Colvin, No. 3:12–CV–01713, 2014 WL 508125, at *1 (M.D. Pa. Feb. 10, 2014) ("based on the above residual functional capacity and the testimony of a vocational expert found that [plaintiff] had the ability to perform unskilled, sedentary work such as a ticket taker, video monitor and telephone receptionist, and that there were a significant number of such jobs in the regional, state and national economies"); Payne v. Astrue, No. 4:11–CV–01113, 2012 WL 5389705, at *10 (M.D. Pa. Nov. 2, 2012) ("based on a residual functional capacity of a limited range of unskilled, sedentary work . . . and the testimony of a vocational expert found that [plaintiff] had the ability to perform work as a sorter, telephone receptionist, and an assembler of small products, and that there were a significant number of such jobs in the regional economy"); Golzak v. Colvin, No. 3:12cv2247, 2014 WL 980752, at *11 (M.D. Pa. Mar. 13, 2014) ("[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except no crawling, kneeling, or climbing ladders / scaffolds. [Plaintiff] must avoid exposure to vibration, temperature extremes, high humidity, wetness or pulmonary irritants. [Plaintiff] could do simple repetitive tasks with low stress defined as having only occasional changes in work setting and no production rate quotas. The [plaintiff] must avoid direct customer service and have only occasional contact with co-workers / supervisors in a position

not requiring good reading / writing skills . . . the impartial vocational expert . . . testified . . . he could perform representative occupations such as cafeteria attendant, <u>office cleaner</u> and <u>courier</u>. The numbers of jobs existing in the region for such occupations are 600; 1,300; and 170 respectively"); <u>Walker v. Commissioner of Social Sec.</u>, No. 12–1650, 2013 WL 3967559, at *6 (W.D. Pa. Aug. 1, 2013) ("limited to light work involving only occasional pushing and pulling with the upper left extremity, <u>no exposure to fumes, odors, dust, gases, and chemical irritants</u>, no more than <u>simple, routine, repetitive tasks</u> not performed in a fast-paced production environment, no more than simple work-related decisions and few workplace changes, no more than occasional interaction with supervisors, coworkers, and the public, and no prolonged reading for content and comprehension, or mathematical work required of a cashier or teller. The vocational expert replied that such a person would be capable of sustaining '<u>office helper</u> jobs,' with 155,000 positions available in the national economy, '<u>mail clerk</u>' jobs, with 159,000 positions available, and 'cafeteria attendant' jobs, with 47,000 positions available"); <u>Niglio v. Colvin</u>, No. 12–1583, 2013 WL 2896875, at *5 (W.D. Pa. June 13, 2013) ("[Plaintiff] limited to light, <u>unskilled work</u>, only occasional lifting and carrying of twenty pounds, frequent lifting and carrying of no more than ten pounds, <u>standing and walking for no more than four hours of an eight hour work day, sitting for no more than six hours, transitioning between sitting and standing every thirty minutes</u>, only occasional pushing and pulling with the lower left extremity, no climbing of ladders, ropes, or scaffolds, no kneeling or crawling, <u>only occasional climbing of ramps and stairs</u>, only occasional balancing, stooping, and crawling, and <u>no concentrated exposure to extreme heat and humidity, fumes, odors, dust, gases, and poor ventilation</u>. The vocational expert responded that such a person would be capable of working as an '<u>office helper</u>,' with 150,000 such positions available in the national economy, as an '<u>information clerk</u>,' with 70,000 positions available, or as a 'packing line worker,' with 75,000 positions available");

Hockensmith v. Astrue, 906 F. Supp.2d 319, 329 (D. Del. Nov. 30, 2012) ("[Plaintiff could] perform a limited range of light work, he retained a RFC to lift up to ten pounds frequently and up to twenty pounds on occasion, and to sit, stand, and/or walk for the duration of an eight-hour workday, but that he must alternately sit and stand / walk at about thirty minute intervals. The ALJ determined that, due to his cervical and lumbar impairments, plaintiff cannot perform activities requiring repetitive neck turning and is limited to the occasional use of his left arm for tasks such as reaching, handling, fingering, and feeling. In addition, because of his COPD, the ALJ determined that plaintiff must avoid climbing to or working at heights or with hazardous/vibrating machinery and cannot work in environments with extreme temperatures or humidity or where odors, dusts, gases, fumes, or other respiratory irritants are present. Further, based upon his mental capacity for work, the ALJ limited plaintiff to simple, unskilled, non-production pace work, with a limitation to not more than occasional contact with supervisors, co-workers, and/or the general public. After considering the VE's testimony, the ALJ concluded that plaintiff could not perform his past work, but could perform a significant number of other jobs in the national economy, including office helper, security clerk, and information clerk") (emphasis added).

"Even if there is a conflict between the VE's testimony and the DOT, an unexplained inconsistency is not per se fatal to the ALJ's determination so long as there is substantial evidence in the record to support the ALJ's finding. Williams v. Barnhart, 424 F. Supp. 2d 796, 800–01 (E.D. Pa. 2006) (citing Rutherford, 339 F.3d at 557). In response to the ALJ's questioning, the VE opined that if plaintiff was able to lift ten pounds frequently, twenty pounds occasionally, and needed to alternate sitting and standing throughout the day . . . [t]he VE further indicated that such an individual could work as an office helper, which is unskilled, light duty work, of which there are 643,000 jobs nationally and 1,500 locally . . . Thus, the ALJ obtained detailed responses from the

VE in response to her hypothetical. The ALJ found such testimony to be consistent with the DOT. The VE's testimony constitutes substantial evidence in the record to support the ALJ's analysis. See Diehl v. Barnhart, 357 F. Supp.2d 804, 823 (E.D. Pa. 2005) ('[W]hile the ALJ did not ask the VE specifically whether there were any conflicts between his testimony and the DOT descriptions of each job, such an inquiry was unnecessary in light of the detailed questioning of the VE by both the ALJ and Plaintiff's attorney.')." Sanborn v. Colvin, No. 13–224, 2014 WL 3900878, at *18 (E.D. Pa. Aug. 11, 2014) (emphasis added).

Since the VE identified a significant number of unskilled, light jobs in the national economy that could be performed by a hypothetical individual with the same vocational profile and RFC as Plaintiff, substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled under the Act. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (which provides that the testimony of a VE constitutes substantial evidence for purposes of judicial review where the hypothetical questioning of the ALJ fairly encompasses an individual's significant limitations that are supported by the record); see also Plummer, 186 F.3d at 431.

"Because the hypothetical posed to the vocational expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. See Covone v. Commissioner Social Sec., 142 Fed. Appx. 585, 2005 WL 1799366 (3d. Cir. July 29, 2005). As the ALJ's decision is supported by the testimony of the vocational expert, the decision is supported by substantial evidence and is, therefore, affirmed. See Plummer, 186 F.3d 422, 431 (3d Cir.1999)." Robinson v. Astrue, No. 10–1568, 2011 WL 1485977, at *13 (W.D. Pa. Apr. 19, 2011).

Accordingly, the VE's testimony supports the ALJ's decision that Plaintiff was not disabled under the Act.

## V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: September 9, 2014                                    s/Gerald B. Cohn
                                                    _____
                                                    GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE